CLIENT # ████████

**EXHIBIT "A"**

**LOT 1, PHASE I OF SOUTHFIELDS OF PALM BEACH POLO AND COUNTRY CLUB – WELLINGTON COUNTRYPLACE – P.U.D., ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 39, PAGE 19, PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.**

LEGAL DESCRIPTION

EXHIBIT A

EXHIBIT A

Return To:

WASHINGTON MUTUAL BANK  FA
2210 ENTERPRISE DR
FLORENCE, SC 29501
DOC OPS M/S FSCE 440

This document was prepared by:
TIFFANI FARRIES

CFN 20070267389
OR BK 21793 PG 0755
RECORDED 06/01/2007 14:43:09
Palm Beach County, Florida
AMT 2,160,400.00
Deed Doc 7,561.40
Intang 4,320.80
Sharon R. Bock,CLERK & COMPTROLLER
Pgs 0755 - 779; (25pgs)

[Space Above This Line For Recording Data]

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated APRIL 13, 2007 together with all Riders to this document.
(B) "Borrower" is JEFFREY M SISKIND

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is WASHINGTON MUTUAL BANK, FA

Lender is a FEDERAL SAVINGS BANK
organized and existing under the laws of THE UNITED STATES OF AMERICA

FLORIDA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3010 1/01

-6(FL) (0005)
Page 1 of 16          Initials:
VMP MORTGAGE FORMS - (800)521-7291

Lender's address is 2273 N. GREEN VALLEY PARKWAY, SUITE 14, HENDERSON, NV
89014
Lender is the mortgagee under this Security Instrument.

(D) "Note" means the promissory note signed by Borrower and dated APRIL 13, 2007
The Note states that Borrower owes Lender TWO MILLION ONE HUNDRED SIXTY
THOUSAND FOUR HUNDRED AND 00/100                                             Dollars
(U.S. $  2,160,400.00     ) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than MAY 01, 2037

(E) "Property" means the property that is described below under the heading "Transfer of Rights
in the Property."

(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late
charges due under the Note, and all sums due under this Security Instrument, plus interest.

(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The
following Riders are to be executed by Borrower (check box as applicable):

[x] Adjustable Rate Rider    [ ] Condominium Rider           [ ] Second Home Rider
[ ] Balloon Rider            [x] Planned Unit Development Rider  [ ] 1-4 Family Rider
[ ] VA Rider                 [ ] Biweekly Payment Rider        [ ] Other(s) (specify)

(H) "Applicable Law" means all controlling applicable federal, state and local statutes,
regulations, ordinances and administrative rules and orders (that have the effect of law) as well as
all applicable final, non-appealable judicial opinions.

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees,
assessments and other charges that are imposed on Borrower or the Property by a condominium
association, homeowners association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction
originated by check, draft, or similar paper instrument, which is initiated through an electronic
terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize
a financial institution to debit or credit an account. Such term includes, but is not limited to,
point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire
transfers, and automated clearinghouse transfers.

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or
proceeds paid by any third party (other than insurance proceeds paid under the coverages
described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or
other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv)
misrepresentations of, or omissions as to, the value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or
default on, the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and
interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials:

-6(FL) (0005)                    Page 2 of 18                    Form 3010 1/01

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, the following described property located in the

COUNTY                          of   PALM BEACH                          :
(Type of Recording Jurisdiction)      [Name of Recording Jurisdiction]

Lot 1, Phase I of SOUTHFIELDS OF PALM BEACH POLO AND COUNTRY CLUB - WELLINGTON COUNTRYPLACE - P.U.D., according to the Plat thereof as recorded in Plat Book 39, Page 19, public records of Palm Beach County, Florida.

Parcel ID Number: ██████████          which currently has the address of
3488 SANTA BARBARA DR                                         [Street]
WELLINGTON                            [City], Florida 33414    [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

6D-6(FL) (0005)          Page 2 of 15          Initials: [signature]          Form 3010 1/01

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be

-6(FL) (0005)                          Page 4 of 16                    Initials: _____        Form 3010 1/01

applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

-6(IL) (0005)　　　　　　　　　　Page 8 of 15　　　Initials: [signature]　　Form 3010 1/01

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of

the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the

date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate

-6B(FL) (0005)    Page 6 of 16    Initials: _____    Form 3010 1/01

from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any

-6(IL) (0005)                Page 9 of 16        Initials:            Form 3010 1/01

other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the

-6(FL) (0008)                    Page 10 of 20          Initials:          Form 3010 1/01

Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security

-6(FL) (0005)                      Page 11 of 16                      Initials: _____          Form 3010 1/01

Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums

-6(FL) (0005)                    Page 12 of 18                    Form 3010 1/01

which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

-6(IL) (0005)   Page 12 of 16   Form 3010 1/01

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Attorneys' Fees. As used in this Security Instrument and the Note, "attorneys' fees" shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

25. Jury Trial Waiver. The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

-6(FL) (0005)                    Page 16 of 16                Initials:              Form 3010 1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained
in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____ WITNESS

_____ (Seal)
JEFFREY M SISKIND           -Borrower

                            _____ (Address)

_____ WITNESS

_____ (Seal)
TANYA L. SISKIND            -Borrower

                            _____ (Address)

_____ (Seal)        _____ (Seal)
-Borrower                               -Borrower

_____ (Address)     _____ (Address)

_____ (Seal)        _____ (Seal)
-Borrower                               -Borrower

_____ (Address)     _____ (Address)

_____ (Seal)        _____ (Seal)
-Borrower                               -Borrower

_____ (Address)     _____ (Address)

-6(FL) (0008)                Page 15 of 16              Form 3010 1/01

STATE OF FLORIDA,   PALM BEACH                                County ss:
The foregoing instrument was acknowledged before me this 12TH Day of April, 2007
by JEFFREY M SISKIND

who is personally known to me or who has produced                            as identification.

Notary Public State of Florida
David Edward Grandpre
My Commission DD548032
Expires 05/03/2010

Notary Public

Page 16 of 16                    Initials:                    Form 3010 1/01

-6(FL) (0005)

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this    **13TH**    day of **APRIL, 2007**    , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to

**WASHINGTON MUTUAL BANK, FA**

(the "Lender")

of the same date and covering the Property described in the Security Instrument and located at:

**3485 SANTA BARBARA DR, WELLINGTON, FL 33414**

[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in **COVENANTS, CONDITIONS AND RESTRICTIONS**

(the "Declaration"). The Property is a part of a planned unit development known as

**PALM BEACH POLO**

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. **PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the: (i) Declaration; (ii) articles of

MULTISTATE PUD RIDER – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

-7R (0008)    Form 3150 1/01
Page 1 of 3    Initials:
VMP MORTGAGE FORMS - (800)521-7291

incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulation" of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

B. Property Insurance. So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

C. Public Liability Insurance. Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

D. Condemnation. The proceeds of any award or claim for damage, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

E. Lender's Prior Consent. Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

-7R (0008)                    Page 2 of 3                Initials:                Form 3150 1/01

F. Remedies. If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD Rider.

| | | |
|---|---|---|
| _____ (Seal) | _____ (Seal) |
| -Borrower | -Borrower |
| | JEFFREY M SISKIND |
| _____ (Seal) | _____ (Seal) |
| -Borrower | -Borrower |
| | TANYA L. SISKIND |
| _____ (Seal) | _____ (Seal) |
| -Borrower | -Borrower |
| _____ (Seal) | _____ (Seal) |
| -Borrower | -Borrower |

@ -7R (0008)                    Page 3 of 3                    Form 3150 1/01

## ADJUSTABLE RATE RIDER
### (12-MTA Index - Payment and Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this ___13TH___ day of
___APRIL, 2007___, and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same
date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the
"Note") to ___WASHINGTON MUTUAL BANK, FA___ (the "Lender") of the
same date and covering the property described in the Security Instrument and located at:

___1485 SANTA BARBARA DR  WELLINGTON, FL  33414___
(PROPERTY ADDRESS)

**THIS RIDER CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY
INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT
INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL
AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY
BORROWED, BUT NOT MORE THAN _115%_ OF THE ORIGINAL AMOUNT (OR
$ _2,484,460.50_ ). MY INTEREST RATE CAN NEVER EXCEED THE
LIMIT STATED IN THE NOTE AND RIDER. A BALLOON PAYMENT MAY BE DUE AT
MATURITY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A.  INTEREST RATE AND MONTHLY PAYMENT CHANGES**
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. Up
until the first day of the calendar month that immediately precedes the first payment due date set
forth in Section 3 of the Note, I will pay interest at a yearly rate of ___8.577___%. Thereafter until the
first Change Date (as defined in Section 4 of the Note) I will pay interest at a yearly rate of
___2.650___%. The interest rate I will pay will thereafter change in accordance with Section 4 of the
Note.

32843 (11-01)                                  Page 1 of 6                           LRD02U9A (VERSION 1.0)

Section 4 of the Note provides for changes in the interest rate and monthly payment as follows:

**4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may change on the 1ST _____ day of JUNE , 2007 _____, and on that day every month thereafter. Each such day is called a "Change Date".

**(B) The Index**

On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of the date 15 days before each Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Interest Rate Change**

Before each Change Date, the Note Holder will calculate my new interest rate by adding THREE AND 55/100 _____ 3.550 % ("Margin") to Current Index. The Note Holder will then round the result of this addition to the nearest one thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). The difference will be rounded to the next higher 1/8 of 1%.

**(D) Interest Rate Limit**

My interest rate will never be greater than 10.850 % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

**(E) Payment Change Dates**

Effective every year commencing JUNE 01, 2008 _____, and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the

32843 (11-01)                        Page 2 of 6                        UR002USB (VERSION 1.0)



amou: of the monthly payment that would be sufficient to repay the projected Principal balance I am expected to owe as of the Payment Change Date in full on the maturity date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of the Note.

**(F) Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This payment cap applies only to the Principal Payment and does not apply to any escrow payments Lender may require under the Security Instrument.

**(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a Principal reduction of the Note.

**(H) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed a maximum amount equal to ___115%___ of the principal amount original borrowed. In the event my unpaid Principal would otherwise exceed that __115%__ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

**(I) Required Full Monthly Payment**

On the __FIFTH__ anniversary of the due date of the first monthly payment, and on that same day every __FIFTH__ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

**(J) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

32843 (11-01)                          Page 3 of 5                          LRD02USC (VERSION 1.0)



**(K) Failure to Make Adjustments**

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid "Principal."

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser. If all or any part of the Property or any interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Agreement or other obligations related to the Note or other loan document is acceptable to Lender, (c) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (d) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption, and Lender may increase the maximum interest rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written assumption agreement with transferee and formally releases Borrower.

32843 (11-01)                 Page 4 of 6                 LRD02USO (VERSION 1.0)

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

32843 (11-01)                    Page 5 of 8                    LRD02USE (VERSION 1.0)

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider. Borrower agrees to execute any document necessary to reform this Agreement to accurately reflect the terms of the Agreement between Borrower and Beneficiary or if the original Note, Trust Deed or other document is lost, mutilated or destroyed.

_____            _____
JEFFREY M SISKIND                       TANYA L. SISKIND

_____            _____

_____            _____

32843 (11-01)                Page 6 of 6                URD02USF (VERSION 1.0)

EXHIBIT B

EXHIBIT B

Prepared By: Albertelli Law
Record and Return To:
Albertelli Law
P.O. Box 23028
Tampa, FL 33623

CFN 20130237711
OR BK 26051 PG 0005
RECORDED 05/29/2013 14:22:46
Palm Beach County, Florida
Sharon R. Bock, CLERK & COMPTROLLER
Pg 0005; (1pg)

### ASSIGNMENT OF MORTGAGE

FOR VALUE RECEIVED, the undersigned assignor ("Assignor") whose address is 1111 Polaris Parkway, Columbus, OH 43240, does hereby grant, bargain, sell, assign, transfer and convey to the following assignee ("Assignee"): U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association as Trustee as successor by merger to Lasalle Bank, National Association as Trustee for WaMu Mortgage Pass-Through Certificates Series 2007-OA5 Trust whose address is 700 KANSAS LANE, MC 8000, MONROE, LA 71203

all of Assignor's right, title and interest all beneficial interest under a certain Mortgage, dated April 13, 2007, made and executed by Jeffrey M. Siskind and Tanya L. Siskind, to Washington Mutual Bank FA, recorded on June 1, 2007 in Official Records Book 21793 at Page 755, of the Public Records of Palm Beach County, Florida.

This assignment is made without recourse to Assignor and without representation or warranty by Assignor, express or implied.

ASSIGNOR:

[CORPORATE SEAL]        JPMorgan Chase Bank, National Association, successor in interest by
purchase from the FDIC as Receiver of Washington Mutual Bank F/K/A
Washington Mutual Bank, FA

By _Elise N Morris_   12/3/12
Elise N Morris Vice President

STATE OF _TEXAS_
COUNTY OF _DENTON_

The undersigned, a notary public in and for the above-said County and State, does hereby
acknowledge that on the day and year set forth below, personally appeared
_ELISE N. MORRIS_ as _Vice President_ on behalf of the
corporation. (She) He is personally known to me or has produced _TX DL_ as identification and
(did) did not take an oath.

WITNESS my hand and official seal this _3rd_ day of _DECEMBER_, 2012.

Notary Public: _WILAYAT ALI SAJJANI_
My commission expires: _10-03-2016_

WILAYAT ALI SAJJANI
Notary Public, State of Texas
My Commission Expires
October 03, 2016

EXHIBIT C

EXHIBIT C

**Return Address:**

Washington Mutual Bank
Office of the Corporate Secretary
1301 2nd Ave., WMC3501
Seattle, WA  98101



```
COOK                     RFF           44.00
PAGE-001 OF 003
10/03/2008 13:11
KING COUNTY, WA
```

Please print or type information **WASHINGTON STATE RECORDER'S Cover Sheet** (RCW 65.04)

**Document Title(s)** (or transactions contained therein): (all areas applicable to your document **must** be filled in)
1. Affidavit of the Federal Deposit
   Insurance Corporation_____    2. _____

3. _____    4. _____

---

**Reference Number(s) of Documents assigned or released:**

Additional reference #'s on page _____ of document

---

**Grantor(s)** Exactly as name(s) appear on document
1. Washington Mutual Bank, formerly known
   as Washington Mutual Bank, FA____ , _____
   Federal Deposit Insurance
2. Corporation_____ , _____

Additional names on page _____ of document.

---

**Grantee(s)** Exactly as name(s) appear on document
1. JPMorgan Chase Bank, National Association_____

2. _____ , _____

Additional names on page _____ of document.

---

**Legal description** (abbreviated: i.e. lot, block, plat or section, township, range)

_____

_____

Additional legal is on page _____ of document.

---

**Assessor's Property Tax Parcel/Account Number**                    ☐ Assessor Tax # not yet
assigned

---

The Auditor/Recorder will rely on the information provided on this form.  The staff will not read the document
to verify the accuracy or completeness of the indexing information provided herein.

---

"I am signing below and paying an additional $50 recording fee (as provided in RCW 36.18.010 and
referred to as an emergency nonstandard document), because this document does not meet margin and
formatting requirements. Furthermore, I hereby understand that the recording process may cover up or
otherwise obscure some part of the text of the original document as a result of this request."

_____Signature of Requesting Party

Note to submitter: Do not sign above nor pay additional $50 fee if the document meets margin/formatting requirements

Recording Requested By and
When Recorded Mail to:

```
Washington Mutual Bank
Office of the Corporate Secretary
1301 2nd Ave., WMC3501
Seattle, WA 98101
```

---

**Space Above for Recording Information**

## AFFIDAVIT OF THE
## FEDERAL DEPOSIT INSURANCE CORPORATION

I, Robert C. Schoppe, having been first duly sworn, hereby make this Affidavit and say that:

1.      I am an authorized representative of the Federal Deposit Insurance Corporation, an agency of the United States government (the "FDIC").

2.      On September 25, 2008, Washington Mutual Bank, formerly known as Washington Mutual Bank, FA ("Washington Mutual"), was closed by the Office of Thrift Supervision and the FDIC was named receiver.

3.      As authorized by Section 11(d)(2)(G)(i)(II) of the Federal Deposit Insurance Act, 12 U.S.C § 1821(d)(2)(G)(i)(II), the FDIC, as receiver of Washington Mutual, may transfer any asset or liability of Washington Mutual without any approval, assignment, or consent with respect to such transfer.

4.      Pursuant to the terms and conditions of a Purchase and Assumption Agreement between the FDIC as receiver of Washington Mutual and JPMorgan Chase Bank, National Association ("JPMorgan Chase"), dated September 25, 2008 (the "Purchase and Assumption Agreement'), JPMorgan Chase acquired certain of the assets, including all loans and all loan commitments, of Washington Mutual.

5.      As a result, on September 25, 2008, JPMorgan Chase became the owner of the loans and loan commitments of Washington Mutual by operation of law.

Executed this *2ND* day of October, 2008 in Seattle, King County, Washington.

By: _____
Print Name: Robert C. Schoppe
Title: Receiver In Charge for FDIC as
Receiver of  Washington Mutual Bank

## NOTARY'S ACKNOWLEDGMENT

STATE OF WASHINGTON      )
                            ) SS.

COUNTY OF KING            )

I certify that I know or have satisfactory evidence that Robert C. Schoppe is the person who appeared before me, and said person acknowledged that he signed this instrument, on oath stated that he was authorized to execute the instrument and acknowledged it as the Receiver In Charge of the Federal Deposit Insurance Corporation, as Receiver of Washington Mutual Bank to be the free and voluntary act of such party for the uses and purposes mentioned therein.

Dated this 2nd day of October, 2008.

Notary Public in and for the State of
Washington, residing in _Richmond_
My commission expires: _11/7/10_

STATE OF WASHINGTON }
County of King

The Director of Records & Licensing, King County, State of
Washington and exofficio Recorder of Deeds and other
instruments, do hereby certify the foregoing copy has been
compared with the original instrument as the same appears
on file and of record in the office and that the same is a true
and perfect transcript of said original and of the whole thereof,
Witness my hand and official seal this _____ day
of_____ 20_____

OCT 0 3 2008
Director of Records & Licensing

By_____
Deputy

R. Harper

53

EXHIBIT D

EXHIBIT D

# ADJUSTABLE RATE NOTE
### (12-MTA Index - Payment and Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN __115%__ OF THE ORIGINAL AMOUNT (OR $__2,484,460.00__). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

__APRIL 13, 2007__          __WEST PALM BEACH__          __FLORIDA__
                            CITY                        STATE

__3465 SANTA BARBARA DR, WELLINGTON, FL 33414__
PROPERTY ADDRESS

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ __2,160,400.00__ plus any amounts added in accordance with Section 4 (G) below, (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is __WASHINGTON MUTUAL BANK, FA__. I will make all payments under this Note in the form of cash, check or money order. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

## 2. INTEREST

Interest will be charged on unpaid Principal until the full amount has been paid. Up until the first day of the calendar month that immediately precedes the first payment due date set forth in Section 3 of this Note, I will pay interest at a yearly rate of __8.577__%. Thereafter until the first Change Date (as defined in Section 4 of this Note) I will pay interest at a yearly rate of __2.550__%. The interest rate required by this Section 2 and Section 4 of this Note is the Rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay Principal and interest by making payments every month. In this Note, "payments" refer to Principal and interest payments only, although other charges such as taxes, insurance and/or late charges may also be payable with the monthly payment.

I will make my monthly payments on __1ST__ day of each month beginning on __JUNE, 2007__. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied to interest before Principal. If, on __MAY 01, 2037__, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".

I will make my monthly payments at __P.O. BOX 78148 PHOENIX, AZ 85062-8148__, or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my monthly payments until the first Payment Change Date will be in the amount of U.S. $ __8,592.46__, unless adjusted at an earlier time under Section 4(H) of this Note.

**(C) Payment Changes**

My monthly payment will be recomputed, according to Sections 4(E)(F)(G)(H) and (I) of this Note, to reflect changes in the Principal balance and interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may further change on the ___1ST___ day of ___JUNE , 2007_____, and on that day every month thereafter. Each such day is called a "Change Date".

**(B) The Index**

On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of 15 days before each interest rate Change Date is called the "Current Index". If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding ___THREE AND 55/100_____ percentage points ___3.550___ % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). This difference will be rounded to the next higher 1/8 of 1%.

**(D) Interest Rate Limit**

My interest rate will never be greater than ___TEN AND 85/100_____ percentage points ___10.850___ % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

**(E) Payment Change Dates**

Effective every year commencing ___JUNE 01, 2008_____, and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the Maturity Date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of this Note.

**(F) Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This payment cap applies only to the principal payment and does not apply to any escrow payments Lender may require under the Security Instrument.

32281 (11-01)                    **Page 2 of 6**                              LNT60FLB (VERSION 1.0)

**(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will ad the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.

**(H) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to ___115%___ of the principal amount original borrowed. In the event my unpaid Principal would otherwise exceed that ___115%___ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

**(I) Required Full Monthly Payment**

On the ___FIFTH___ anniversary of the due date of the first monthly payment, and on that same day every ___FIFTH___ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

**(J) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(K) Failure to Make Adjustments**

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial Prepayment of unpaid Principal.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will apply all of my prepayments to reduce the amount of principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the principal amount of the Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may have the effect of reducing the amount of my monthly payments, but only after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

32281 (11-01)                    Page 3 of 6                              LNT60FLC (VERSION 1.0)

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**Miscellaneous Fees:** I understand that the Note Holder will also charge a return item charge in the event a payment that I make in connection with repayment of this loan is not honored by the financial institution on which it is drawn. The current fee is $ 15.00 . Lender reserves the right to change the fee from time to time without notice except as may be required by law.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of FIFTEEN calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once of each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 10 days after the date on which the notice is delivered or mailed to me (or, if the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation buys all or part of Lender's rights under the Security Instrument, in which case the notice will specify a date, not less than 30 days from the date the notice is given the Borrower).

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note, whether or not a lawsuit is brought, to the extent not prohibited by Applicable Law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless Applicable Law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

32281 (11-01)                          Page 4 of 6                          LNT60FLD (VERSION 1.0)

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.**

If all or any part of the Property or any Interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) the request to assume is made after one year following recordation of the Deed of Trust, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument or other obligations related to the Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption and Lender may increase the maximum rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written Assumption Agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**12. MISCELLANEOUS PROVISIONS**

In the event the Note Holder at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical or ministerial mistake, calculation error, computer error, printing error or similar error (collectively "Errors"), I agree, upon notice from the Note Holder, to reexecute any Loan Documents that are necessary to correct any such Errors and I also agree that I will not hold the Note Holder responsible for any damage to me which may result from any such Errors.

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Note Holder delivers to me an indemnification in my favor, signed by the Note Holder, then I will sign and deliver to the Note Holder a Loan Document identical in form and content which will have the effect of the original for all purposes.

32281 (11-01)                    Page 5 of 6                    LNT60FLE (VERSION 1.0)

**13. DOCUMENTARY TAX**

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND (S) AND SEAL (S) OF THE UNDERSIGNED.

JEFFREY M SISKIND

Pay to the order of

Without Recourse
Washington Mutual Bank, FA

Cynthia A. Riley, Vice President

32281 (11-01)                    Page 6 of 6                    LNT60FLF (VERSION 1.0)

60

EXHIBIT E

EXHIBIT E

### LOAN MODIFICATION AGREEMENT

This Loan Modification Agreement ("Agreement") is effective February 1, 2016, between JEFFREY SISKIND, ("Borrower") and Select Portfolio Servicing, Inc., acting on behalf of the owner of the Note, ("Lender"). If Borrower's representations and covenants in Section 1 continue to be true in all material respects, then this Agreement will amend and supplement, as set forth in Section 2, the Note made by the Borrower, dated April 13, 2007, in the original principal sum of $2,160,400.00 ("Note"). The Mortgage or Deed of Trust ("Security Instrument"), which was entered into as security for the Note, encumbers the real and personal property described in the Security Instrument (defined in the Security Instrument as the "Property"), known as:

    3465 SANTA BARBARA DR
    WELLINGTON, FL 33414

The Note and Security Instrument are collectively referred to in this Agreement as the "Loan Documents."

1.  <u>Borrower Representations and Covenants.</u> Borrower certifies, represents, covenants, and agrees as follows:

    a.  Borrower is experiencing a financial hardship, and as a result, (i) is in default under the Note or default is imminent, and (ii) Borrower does not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future.

    b.  There has been no impermissible change in the ownership of the Property since Borrower signed the Note.

    c.  If requested by Lender, Borrower has provided documentation for all income that they receive.

    d.  All documents and information Borrower has provided to Lender in connection with this Agreement, including the documents and information regarding eligibility for this Agreement, are complete, true and correct.

    e.  Borrower has made or will make all payments required under a trial modification plan or loan workout plan, if applicable.

    f.  The property is neither in a state of disrepair, nor condemned.

2.  <u>The Modification.</u> If Borrower's representations and covenants in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on February 1, 2016 (the "Modification Effective Date") and all late charges that remain unpaid will be waived. Borrower understands that if they fail to make any payments as a precondition to this modification under a workout plan or trial modification plan, this modification will not take effect. The first modified payment will be due on March 1, 2016.

    a.  The Maturity Date will be: May 1, 2037.

    b.  The modified principal balance of the Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, collectively, "Unpaid Amounts") less any amounts paid to the Lender but not previously credited to the account associated with the Note. The new principal balance of the Note will be $2,916,369.04 (the "New Principal Balance"). Borrower understands that by agreeing to add the Unpaid Amounts to the outstanding principal balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement. Borrower also understands that this means interest will now accrue on the unpaid interest that is added to the outstanding principal balance, which would not happen without this Agreement.

    c.  $405,200.00 of the New Principal Balance shall be deferred (the "Deferred Principal Balance") and will be treated as a non-interest bearing principal forbearance. Borrower will not pay interest or make monthly payments on the Deferred Principal Balance. The New Principal Balance less the Deferred Principal Balance shall be referred to as the "Interest Bearing Principal Balance" and this amount is $2,511,169.04. Interest at the rate of 2.000% will begin to accrue on the Interest Bearing Principal Balance as of February 1, 2016 and the first new monthly payment on the Interest Bearing Principal Balance will be due on March 1, 2016. The payment schedule for the modified Lien Documents is as follows:



| Months | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins On | Number of Monthly Payments |
|---|---|---|---|---|---|---|---|
| 1 - 60 | 2.000% | February 1, 2016 | $7,604.46 | $2,570.46, may adjust periodically | $10,174.92, may adjust periodically | March 1, 2016 | 60 |
| 61 - 72 | 3.000% | February 1, 2021 | $8,834.62 | $2,570.46 | $11,405.08 | March 1, 2021 | 12 |
| 73 - 255 | 3.750% | February 1, 2022 | $9,799.89 | $2,570.46 | $12,370.35 | March 1, 2022 | 183 |

**A final balloon payment on the Interest Bearing Principal Balance of $1,581,848.62 is due on the Maturity Date.**

The Deferred Principal Balance of $405,200.00 will be due as a balloon payment on the earlier of, payoff of the Interest Bearing Principal Balance, transfer of the property or on the Modified Maturity Date. The above terms in this Section 2.c shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable or step interest rate.

*The escrow payments may be adjusted periodically in accordance with applicable law and therefore the total monthly payment may change accordingly.

The above terms in this section 2.c shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable, step or simple interest rate. Interest will be charged on unpaid principal until the full amount of Principal has been paid. Borrower will pay interest at a yearly rate of 2.000%.

BALLOON NOTICE. THE AMORTIZATION TERM OF THE LOAN IS 480 MONTHS. AS A RESULT, BORROWER WILL BE REQUIRED TO REPAY THE ENTIRE PRINCIPAL BALANCE AND ANY ACCRUED INTEREST THEN OWING ON THE MATURITY DATE. LENDER HAS NO OBLIGATION TO REFINANCE THIS LOAN, INCLUDING THE DEFERRED PRINCIPAL BALANCE, AT THE END OF TERM. THEREFORE, BORROWER MAY BE REQUIRED TO REPAY THE LOAN OUT OF ASSETS THEY OWN, OR BORROWER MAY HAVE TO FIND ANOTHER LENDER WILLING TO REFINANCE THE LOAN. ASSUMING ANOTHER LENDER REFINANCES THIS LOAN AT MATURITY, BORROWER MAY BE CHARGED INTEREST AT MARKET RATES PREVAILING AT THAT TIME AND SUCH RATES MAY BE HIGHER THAN THE INTEREST RATE PAID ON THE NOTE. BORROWER MAY ALSO HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW MORTGAGE LOAN.

d.  Borrower has agreed to establish an escrow account to pay for property taxes and homeowner's insurance and pay a monthly escrow payment in the initial amount of $2,570.46. Borrower's total monthly payment of principal, interest and escrow will therefore be equal to $10,174.92. Borrower acknowledges that the payments attributable to insurance and taxes are determined by the state taxing authorities and insurance companies and therefore, are subject to change from time to time. Borrower will be notified of any changes.

3.  <u>Other Agreements</u>. Borrower and Lender also agree to the following:

a.  This Agreement shall supersede any modification, forbearance, trial period plan, or other workout plan that Borrower previously entered into with Lender.

b.  The Security Instrument and Note, as modified by this Agreement, are duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

c.  All terms of the Security Instrument and Note, except as expressly modified by this Agreement, or by the U.S. Bankruptcy Code, remain in full force and effect. Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Note and Security Instrument.

d.  Borrower will be bound by and comply with all covenants, agreements, and requirements of the Note as modified by the Agreement and the Security Instrument, including all requirements to make payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that the Borrower is obligated to make under the Note and Security Instrument.



e.    If any document is lost, misplaced, misstated or inaccurately reflects the true and correct terms and conditions of the Loan Documents as amended by this Agreement, within ten (10) days after receipt of the Lender's request, Borrower will execute, acknowledge, initial, and deliver to the Lender any documentation the Lender deems necessary to replace or correct the lost, misplaced, misstated or inaccurate document(s).  If Borrower fails to do so, Borrower will be liable for any and all loss or damage which the Lender reasonably sustains as a result of Borrower's failure. At Lender's option, this Agreement will be void and of no legal effect upon notice of such loss, misplacement, misstatement, or inaccuracy. If Borrower elects not to sign any such corrective documentation, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and Borrower will not be eligible for a modification.

f.    The mortgage insurance premiums due from Borrower, if applicable, may increase as a result of the capitalization, which will result in a higher total monthly payment. Furthermore, the date on which Borrower may request cancellation of mortgage insurance may change as a result of the New Principal Balance.

g.    As of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, Borrower agrees as follows: If all or any part of the Property or any interest in it is sold or transferred without the Lender's prior written consent, the Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage.  However, the Lender shall not exercise this option if federal law prohibits the exercise of such option as of the date of such sale or transfer.  If the Lender exercises this option, the lender shall give borrower notice of acceleration. The notice shall provide a period of not less than thirty (30) days – depending on state law and other requirements – from the date the notice is delivered or mailed within which Borrower must pay all sums secured by the Mortgage.  If Borrower fails to pay these sums prior to the expiration of this period, the Lender may invoke any remedies permitted by the Mortgage without further notice or demand on the Borrower.

h.    As of the Modification Effective Date, a buyer of the Property will not be permitted, under any circumstance, to assume the Loan.  In any event, this Agreement may not be assigned to, or assumed by, a buyer of the Property.

i.    All payment amounts specified in this Agreement assume that payments will be made as scheduled.

j.    If Borrower is in bankruptcy upon execution of this document, Borrower will cooperate fully with Lender in obtaining any required bankruptcy court and trustee approvals in accordance with local court rules and procedures. Borrower understands that if such approvals are not received, then the terms of this Agreement will be null and void. If this Agreement becomes null and void, the terms of the original Loan Documents shall continue in full force and effect, and such terms shall not be modified by this Agreement.

k.    If Borrower(s) received a discharge in a Chapter 7 bankruptcy subsequent to the execution of the Loan Documents, Lender agrees that such Borrower(s) will not have personal liability on the debt pursuant to this Agreement.

l.    In agreeing to the changes to the original Loan Documents as reflected in this Agreement, Lender has relied upon the truth and accuracy of all of the representations made by Borrower(s), both in this Agreement and in any documentation provided by or on behalf of Borrower(s) in connection with this Agreement. If Lender subsequently determines that such representations or documentation were not truthful or accurate, Lender may, at its option, rescind this Agreement and reinstate the original terms of the Loan Documents as if this Agreement never occurred.

The Borrower(s) and Lender have signed this Agreement as of the Effective Date.

Borrower Signature: _____     Date: _3-21-16_

Borrower Signature: _____     Date: _MAR 3 0 2016_

Select Portfolio Servicing, Inc. (On behalf of Lender):     Date: _____

Heather Perkins-Canas
Document Control Officer

DIGIMA⸱⸱        MAR 2 2 2016

64

## LOAN MODIFICATION AGREEMENT

This Loan Modification Agreement ("Agreement") is effective 06/01/2020, between JEFFREY SISKIND, ("Borrower") and Select Portfolio Servicing, Inc., acting on behalf of the owner of the Note, ("Lender"). If Borrower's representations and covenants in Section 1 continue to be true in all material respects, then this Agreement will amend and supplement, as set forth in Section 2, the Note made by the Borrower, dated 04/13/2007, in the original principal sum of $2,160,400.00 ("Note"). The Mortgage or Deed of Trust ("Security Instrument"), which was entered into as security for the Note, encumbers the real and personal property described in the Security Instrument (defined in the Security Instrument as the "Property"), known as:

    3465 SANTA BARBARA DR
    WELLINGTON, FL 33414

The Note and Security Instrument are collectively referred to in this Agreement as the "Loan Documents."

1.  <u>Borrower Representations and Covenants.</u> Borrower certifies, represents, covenants, and agrees as follows:

    a.  Borrower is experiencing a financial hardship, and as a result, (i) is in default under the Note or default is imminent, and (ii) Borrower does not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future.

    b.  There has been no impermissible change in the ownership of the Property since Borrower signed the Note.

    c.  If requested by Lender, Borrower has provided documentation for all income that they receive.

    d.  All documents and information Borrower has provided to Lender in connection with this Agreement, including the documents and information regarding eligibility for this Agreement, are complete, true and correct.

    e.  Borrower has made or will make all payments required under a trial modification plan or loan workout plan, if applicable.

    f.  The property is neither in a state of disrepair, nor condemned.

2.  <u>The Modification.</u> If Borrower's representations and covenants in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on 06/01/2020 (the "Modification Effective Date") and all late charges that remain unpaid will be waived. Borrower understands that if they fail to make any payments as a precondition to this modification under a workout plan or trial modification plan, this modification will not take effect. The first modified payment will be due on 07/01/2020.

    a.  The Maturity Date will be: 05/01/2037.

    b.  The modified principal balance of the Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, collectively, "Unpaid Amounts") less any amounts paid to the Lender but not previously credited to the account associated with the Note. The new principal balance of the Note will be $3,170,501.30 (the "New Principal Balance"). Borrower understands that by agreeing to add the Unpaid Amounts to the outstanding principal balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement. Borrower also understands that this means interest will now accrue on the unpaid interest that is added to the outstanding principal balance, which would not happen without this Agreement.

    c.  $951,150.39 of the New Principal Balance shall be deferred (the "Deferred Principal Balance") and will be treated as a non-interest bearing principal forbearance. Borrower will not pay interest or make monthly payments on the Deferred Principal Balance. The New Principal Balance less the Deferred Principal Balance shall be referred to as the "Interest Bearing Principal Balance" and this amount is $2,219,350.91. Interest at the rate of 3.375% will begin to accrue on the Interest Bearing Principal Balance as of 06/01/2020 and the first new monthly payment on the Interest Bearing Principal Balance will be due on 07/01/2020. The payment schedule for the modified Note is as follows:

| Months | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins On | Number of Monthly Payments |
|--------|--------------|---------------------------|----------------------------------------------|------------------------------------------|------------------------|-------------------|----------------------------|
| 1-203 | 3.37500% | N/A | $8,431.98 | $2,778.36, which may adjust periodically | $11,210.34, which may adjust periodically | 07/01/2020 | 203 |

**A final balloon payment on the Interest Bearing Principal Balance of $1,620,924.68 is due on the Maturity Date.**

The Deferred Principal Balance of $951,150.39 will be due as a balloon payment on the earlier of, payoff of the Interest Bearing Principal Balance, transfer of the property or on the Modified Maturity Date. The above terms in this Section 2.c shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable or step interest rate.

*The escrow payments may be adjusted periodically in accordance with applicable law and therefore the total monthly payment may change accordingly.

The above terms in this section 2.c shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable, step or simple interest rate. Interest will be charged on unpaid principal until the full amount of Principal has been paid. Borrower will pay interest at a yearly rate of 3.375%.

BALLOON NOTICE. In order to reach an affordable payment, we extended your amortization term, which is the rate or speed by which your mortgage is calculated to be paid off; however, your maturity term, which is the period of time until your mortgage becomes due and payable, could not be fully extended to an equal term. This is because the investor on your account allows us to change your amortization term but does not allow us to change the maturity term to match. As a result of the difference between these two periods, there will be an amount due of $1,620,924.68 on the date your lien matures on 05/01/2037. The amount due at maturity is in addition to your monthly scheduled payment and the principal forbearance of $951,150.39 that you received as part of your modification.

d. Borrower, has agreed to establish an escrow account to pay for property taxes and homeowner's insurance and pay a monthly escrow payment in the initial amount of $2,778.36. Borrower,'s total monthly payment of principal, interest and escrow will therefore be equal to $11,210.34. Borrower, acknowledges that the payments attributable to insurance and taxes are determined by the state taxing authorities and insurance companies and therefore, are subject to change from time to time. Borrower, will be notified of any changes.

3. Other Agreements. Borrower and Lender also agree to the following:

   a. This Agreement shall supersede any modification, forbearance, trial period plan, or other workout plan that Borrower previously entered into with Lender.

   b. The Security Instrument and Note, as modified by this Agreement, are duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

   c. All terms of the Security Instrument and Note, except as expressly modified by this Agreement, or by the U.S. Bankruptcy Code, remain in full force and effect. Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Note and Security Instrument.

   d. Borrower will be bound by and comply with all covenants, agreements, and requirements of the Note as modified by the Agreement and the Security Instrument, including all requirements to make payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that the Borrower is obligated to make under the Note and Security Instrument.

e.  If any document is lost, misplaced, misstated or inaccurately reflects the true and correct terms and conditions of the Loan Documents as amended by this Agreement, within ten (10) days after receipt of the Lender's request, Borrower will execute, acknowledge, initial, and deliver to the Lender any documentation the Lender deems necessary to replace or correct the lost, misplaced, misstated or inaccurate document(s).  If Borrower fails to do so, Borrower will be liable for any and all loss or damage which the Lender reasonably sustains as a result of Borrower's failure. At Lender's option, this Agreement will be void and of no legal effect upon notice of such loss, misplacement, misstatement, or inaccuracy. If Borrower elects not to sign any such corrective documentation, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and Borrower will not be eligible for a modification.

f.  The mortgage insurance premiums due from Borrower, if applicable, may increase as a result of the capitalization, which will result in a higher total monthly payment. Furthermore, the date on which Borrower may request cancellation of mortgage insurance may change as a result of the New Principal Balance.

g.  As of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, Borrower agrees as follows: If all or any part of the Property or any interest in it is sold or transferred without the Lender's prior written consent, the Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. However, the Lender shall not exercise this option if federal law prohibits the exercise of such option as of the date of such sale or transfer.  If the Lender exercises this option, the lender shall give borrower notice of acceleration. The notice shall provide a period of not less than thirty (30) days – depending on state law and other requirements – from the date the notice is delivered or mailed within which Borrower must pay all sums secured by the Mortgage.  If Borrower fails to pay these sums prior to the expiration of this period, the Lender may invoke any remedies permitted by the Mortgage without further notice or demand on the Borrower.

h.  As of the Modification Effective Date, a buyer of the Property will not be permitted, under any circumstance, to assume the Loan.  In any event, this Agreement may not be assigned to, or assumed by, a buyer of the Property.

i.  All payment amounts specified in this Agreement assume that payments will be made as scheduled.

j.  If Borrower is in bankruptcy upon execution of this document, Borrower will cooperate fully with Lender in obtaining any required bankruptcy court and trustee approvals in accordance with local court rules and procedures. Borrower understands that if such approvals are not received, then the terms of this Agreement will be null and void. If this Agreement becomes null and void, the terms of the original Loan Documents shall continue in full force and effect, and such terms shall not be modified by this Agreement.

k.  If Borrower(s) received a discharge in a Chapter 7 bankruptcy subsequent to the execution of the Loan Documents, Lender agrees that such Borrower(s) will not have personal liability on the debt pursuant to this Agreement.

l.  In agreeing to the changes to the original Loan Documents as reflected in this Agreement, Lender has relied upon the truth and accuracy of all of the representations made by Borrower(s), both in this Agreement and in any documentation provided by or on behalf of Borrower(s) in connection with this Agreement. If Lender subsequently determines that such representations or documentation were not truthful or accurate, Lender may, at its option, rescind this Agreement and reinstate the original terms of the Loan Documents as if this Agreement never occurred.

**TAX CONSEQUENCES OF LOAN MODIFICATIONS.** There may be income tax consequences related to this loan modification. Because you will be responsible for paying any income tax due as a result of this loan modification, you may wish to consult a tax advisor before accepting this loan modification.

The Borrower(s) and Lender have signed this Agreement as of the Effective Date.

Borrower Signature: _____    Date: 4/28/2020 _____

Borrower Signature: _____    Date: _____

Yanko D. Arreguin
Document Control Officer

Select Portfolio Servicing, Inc. (On behalf of Lender):    Date: MAY 1 4 2020

DIGIMAIL
MAY 0 1 2020

67

EXHIBIT F

EXHIBIT F

Document drafted and
Recording requested by
Corp Legal Dept.
Select Portfolio Servicing, Inc.
3217 S. Decker Lake Dr.
Salt Lake City, Utah 84119

E 3443989 B 7909 P 376-382
RICHARD T. MAUGHAN
DAVIS COUNTY, UTAH   RECORDER
12/20/2021 09:30 AM
FEE $40.00  Pgs: 7
DEP RTT  REC'D FOR SELECT PORTFOLIO
   SERVICING INC

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## LIMITED POWER OF ATTORNEY

**The trusts identified on the attached Schedule A (the "Trusts"),** by and through **U.S. Bank National Association,** a national banking association organized and existing under the laws of the United States and having an office at 190 S. La Salle Street, MK-IL-SL7R, Chicago, IL 60603, not in its individual capacity but solely as Trustee or indenture trustee ("Trustee"), hereby constitutes and appoints Select Portfolio Servicing, Inc. ("Servicer"), having an office at 3217 S. Decker Lake Dr., Salt Lake City, UT 84119 and in its name, aforesaid Attorney-In-Fact, by and through any officer appointed by the Board of Directors of Servicer, to execute and acknowledge in writing or by facsimile stamp all documents customarily and reasonably necessary and appropriate for the tasks described in the items (1) through (12) below; provided however, that (a) the documents described below may only be executed and delivered by such Attorneys-In-Fact if such documents are required or permitted under the terms of the related servicing agreements, (b) all actions taken by Servicer pursuant to this Limited Power of Attorney must be in accordance with Federal, State and local laws and procedures, as applicable and (c) no power is granted hereunder to take any action that would be either adverse to the interests of or be in the name of U.S. Bank National Association in its individual capacity. This Limited Power of Attorney is being issued in connection with Servicer's responsibilities to service certain mortgage loans (the "Loans") held by the Trustee. These Loans are secured by collateral comprised of mortgages, deeds of trust, deeds to secure debt and other forms of security instruments (collectively the "Security Instruments") encumbering any and all real and personal property delineated therein (the "Property") and the Notes secured thereby. Please refer to **Schedule A** attached hereto.

1.    Demand, sue for, recover, collect and receive each and every sum of money, debt, account and interest (which now is, or hereafter shall become due and payable) belonging to or claimed by the Trustee, and to use or take any lawful means for recovery by legal process or otherwise, including but not limited to the substitution of trustee serving under a Deed of Trust, the preparation and issuance of statements of breach, notices of default, and/or notices of sale, accepting deeds in lieu of foreclosure, evicting (to the extent allowed by federal, state or local laws), foreclosing on the properties under the Security Instruments by judicial or non-judicial foreclosure, instituting actions for temporary restraining orders, quiet title, injunctions, appointments of receiver, waste, fraud and any and all other legal actions, in tort, contract or otherwise, necessary to enforce the terms of the Security Instrument and to execute such verifications in support thereof, as may be necessary or advisable in any state or federal suit, bankruptcy action, administrative hearing or other proceeding.

69

2.  Execute and/or file such documents and take such other action as is proper and necessary to defend the Trustee in litigation and to resolve any litigation where the Servicer has an obligation to defend the Trustee, including but not limited to dismissal, termination, cancellation, rescission and settlement.

3.  Transact business of any kind regarding the Loans, as the Trustee's act and deed, to contract for, purchase, receive and take possession and evidence of title in and to the Property and/or to secure payment of a promissory note or performance of any obligation or agreement relating thereto.

4.  Execute, complete, indorse or file bonds, notes, mortgages, deeds of trust and other contracts, agreements and instruments regarding the borrowers and/or the Property, including but not limited to the execution of estoppel certificates, financing statements, continuation statements, releases, satisfactions, reconveyances, assignments, loan modification agreements, payment plans, waivers, consents, amendments, forbearance agreements, loan assumption agreements, subordination agreements, property adjustment agreements, management agreements, listing agreements, purchase and sale agreements, short sale transactions and other instruments pertaining to mortgages or deeds of trust, and execution of deeds and associated instruments, if any, conveying the Property, in the interest of the Trustee.

5.  Endorse on behalf of the undersigned all checks, drafts and/or other negotiable instruments made payable to the undersigned.

6.  Execute any document or perform any act in connection with the administration of any PMI policy or LPMI policy, hazard or other insurance claim relative to the Loans or related Property.

7.  Execute any document or perform any act described in items (3), (4), and (5) in connection with the termination of any Trust as necessary to transfer ownership of the affected Loans to the entity (or its designee or assignee) possessing the right to obtain ownership of the Loans.

8.  Subordinate the lien of a mortgage, deed of trust, or deed or other security instrument to secure debt (i) for the purpose of refinancing Loans, where applicable, or (ii) to an easement in favor of a public utility company or a government agency or unit with powers of eminent domain, including but not limited to the execution of partial satisfactions and releases and partial reconveyances reasonably required for such purpose, and the execution or requests to the trustees to accomplish the same.

9.  Convey the Property to the mortgage insurer, or close the title to the Property to be acquired as real estate owned, or convey title to real estate owned property ("REO Property").

10. Execute and deliver any documentation with respect to the sale, maintenance, preservation, renovation, repair, demolition or other disposition, of REO Property acquired through a foreclosure or deed-in-lieu of foreclosure, including, without limitation: permits, remediation plans or agreements, certifications, compliance certificates, health and safety certifications, listing agreements; purchase and sale agreements; grant / limited or special warranty / quit claim deeds or any other deed, but not general warranty deeds, causing the transfer of title of

the property to a party contracted to purchase same; escrow instructions; and any and all documents necessary to effect the transfer of REO Property.

11. Servicer has the power to execute additional limited powers of attorney and delegate the authority given to it by U.S. Bank National Association, as Trustee, under the applicable servicing agreements for the Trusts listed on Schedule A, attached.

12. To execute, record, file and/or deliver any and all documents of any kind for the purpose of fulfilling any servicing duties, including but not limited to those listed in subparagraphs (1) through (11), above, where Trustee's interest is designated, stated, characterized as or includes any reference to one or more of the following: "Trustee", "Owner Trustee", "Successor Trustee", "Successor in Interest", "Successor to" "Successor by Merger", "Trustee/Custodian", "Custodian/Trustee" or other similar designation.

Trustee also grants unto Servicer the full power and authority to correct ambiguities and errors in documents necessary to effect or undertake any of the items or powers set forth in items (1) to (12), above.

In addition to the indemnification provisions set forth in the applicable servicing agreements for the Trusts listed on Schedule A, attached, Servicer hereby agrees to indemnify and hold the Trustee, and its directors, officers, employees and agents harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever incurred by reason or result of the misuse of this Limited Power of Attorney by the Servicer. The foregoing indemnity shall survive the termination of this Limited Power of Attorney and the related servicing agreements or the earlier resignation or removal of the Trustee for the Trusts listed on Schedule A.

**Witness** my hand and seal this 26th day of November, 2021.

**NO CORPORATE SEAL**                    On Behalf of the Trusts, by
                                         U.S. Bank National Association, as Trustee


Witness:  Eneida Murillo                 By: _____
                                             Michael G. Patiuk, Vice President


Witness:  Jose Amaya

71

# CORPORATE ACKNOWLEDGMENT

State of Minnesota

County of Ramsey

On this 26th day of November, 2021, before me, the undersigned, a Notary Public in and for said County and State, personally appeared Michael G. Patiuk, Jose Amaya , and Eneida Murillo, personally known to me, who being duly sworn, did depose and say that he/she/they have a place of business at 60 Livingston Avenue, EP-MN-WS3D,St. Paul, MN 55107; that he/she/they is (are) the Vice President of U.S. Bank National Association, a national banking association, as Trustee, witness and witness, respectively and acknowledged to me that such national banking association executed the within instrument voluntarily and for its stated purpose pursuant to its by-laws or a resolution of its Board of Directors.

WITNESS my hand and official seal.

Signature: _____

Brad J. Weber

My commission expires:  1/31/2024

Brad J Weber
NOTARY PUBLIC
MINNESOTA
My Commission Expires Jan. 31, 2024

**72**

## Schedule A

WaMu Mortgage Pass-Through Certificates Series 2005-AR15, U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association as Trustee successor by merger to LaSalle Bank, National Association as Trustee

WaMu Mortgage Pass-Through Certificates Series 2005-AR19, U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association as Trustee successor by merger to LaSalle Bank, National Association as Trustee

WaMu Mortgage Pass-Through Certificates Series 2006-AR11, U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association as Trustee successor by merger to LaSalle Bank, National Association as Trustee

WaMu Mortgage Pass-Through Certificates Series 2007-HY1 Trust, U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association as Trustee as successor by merger to LaSalle Bank, National Association as Trustee

WaMu Mortgage Pass-Through Certificates Series 2007-HY2 Trust, U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association as Trustee as successor by merger to LaSalle Bank, National Association as Trustee

WaMu Mortgage Pass-Through Certificates Series 2007-HY3 Trust, U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association as Trustee as successor by merger to LaSalle Bank, National Association as Trustee

WaMu Mortgage Pass-Through Certificates Series 2007-HY4 Trust, U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association as Trustee as successor by merger to LaSalle Bank, National Association as Trustee

WaMu Mortgage Pass-Through Certificates Series 2007-HY5 Trust, U.S. Bank National Association , as Trustee, successor in interest to Bank of America, National Association as Trustee as successor by merger to LaSalle Bank, National Association as Trustee

WaMu Mortgage Pass-Through Certificates Series 2007-HY6 Trust, U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association as Trustee as successor by merger to LaSalle Bank, National Association as Trustee

WaMu Mortgage Pass-Through Certificates Series 2007-HY7 Trust, U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association as Trustee as successor by merger to LaSalle Bank, National Association as Trustee

WaMu Mortgage Pass-Through Certificates Series 2007-OA1 Trust, U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association as Trustee as successor by merger to LaSalle Bank, National Association as Trustee

WaMu Mortgage Pass-Through Certificates Series 2007-OA2 Trust, U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association as Trustee as successor by merger to LaSalle Bank, National Association as Trustee

WaMu Mortgage Pass-Through Certificates Series 2007-OA3 Trust, U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association as Trustee as successor by merger to LaSalle Bank, National Association as Trustee

WaMu Mortgage Pass-Through Certificates Series 2007-OA4 Trust, U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association as Trustee as successor by merger to LaSalle Bank, National Association as Trustee

WaMu Mortgage Pass-Through Certificates Series 2007-OA5 Trust, U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association as Trustee as successor by merger to LaSalle Bank, National Association as Trustee

WaMu Mortgage Pass-Through Certificates Series 2007-OA6 Trust, U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association as Trustee as successor by merger to LaSalle Bank, National Association as Trustee

Washington Mutual Mortgage Pass-Through Certificates WMALT Series 2006-5 Trust, U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association as Trustee as successor by merger to LaSalle Bank, National Association as Trustee

Washington Mutual Mortgage Pass-Through Certificates WMALT Series 2006-AR5 Trust, U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association as Trustee as successor by merger to LaSalle Bank, National Association as Trustee

Washington Mutual Mortgage Pass-Through Certificates WMALT Series 2006-AR8 Trust, U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association as Trustee as successor by merger to LaSalle Bank, National Association as Trustee

Washington Mutual Mortgage Pass-Through Certificates WMALT Series 2006-AR9 Trust, U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association as Trustee as successor by merger to LaSalle Bank, National Association as Trustee

Washington Mutual Mortgage Pass-Through Certificates WMALT Series 2007-2 Trust, U.S. Bank National Association, as Trustee

Washington Mutual Mortgage Pass-Through Certificates WMALT Series 2007-OA1 Trust, U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association as Trustee as successor by merger to LaSalle Bank, National Association as Trustee

Washington Mutual Mortgage Pass-Through Certificates WMALT Series 2007-OA3 Trust, U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association as Trustee as successor by merger to LaSalle Bank, National Association as Trustee

Washington Mutual Mortgage Pass-Through Certificates WMALT Series 2007-OA5 Trust, U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association as Trustee as successor by merger to LaSalle Bank, National Association as Trustee

EXHIBIT G

EXHIBIT G



## MFR Post-Petition Payment History for Filing

| Loan Information | |
|---|---|
| Loan Number | 3501 |
| Debtors Name - 1 | SISKIND, JEFFREY M |
| Debtors Name - 2 | - |
| Property Address | 3465 SANTA BARBARA DR |
| Property State | FL |

| Bankruptcy Information | |
|---|---|
| Bankruptcy Case # | 23-11720 |
| Filing Date | 03/23/2023 |
| Person filing | JEFFREY M SISKIND |
| Number of previous filings | 2 |

| Post Petition Default Information | |
|---|---|
| Post petition due date | 04/01/2023 |
| Post petition amount due | $33,880.74 |
| Escrow Shortage | $0.00 |
| Suspense | $0.00 |
| Total Post petition due | $33,880.74 |

| Post Petition Payment History | | | | |
|---|---|---|---|---|
| Post Pmt Rcpt | Post Due Dt Pd | Mo $ Due | $ Received | Comments |
| Due | 04/01/2023 | $11,293.58 | $0.00 | |
| Due | 05/01/2023 | $11,293.58 | $0.00 | |
| Due | 06/01/2023 | $11,293.58 | $0.00 | |
| Total Due | | $33,880.74 | | Total Pmts Due |
| Total Received | | | $0.00 | $33,880.74 |